UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *  Criminal Action No. 1:24-cr-10281-IT-2 |
| JOAN AVALO-QUEZADA, | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

December 10, 2025

TALWANI, D.J.

A federal grand jury returned an indictment charging Defendant Joan Avalo-Quezada and seven others with one count of conspiracy to distribute and to possess with intent to distribute fentanyl, in violation of 21 U.S.C. § 846. Indictment 2 [Doc. No. 74]. Defendant now moves to "suppress . . . all fruits of the unlawful searches and seizures, including, but not limited to, a quantity of controlled substances, and two cellular phones taken from him" on December 14, 2021. Mot. to Suppress 1 [Doc. No. 218]. Defendant contends that the stop of the vehicle in which he was a passenger, the warrantless search of the vehicle and a closed container within it, and the arrest and cell phone seizures resulting therefrom violated his Fourth Amendment rights. Mem. ISO Mot. to Suppress 1–11 [Doc. No. 219]. For the reasons set forth below, Defendant's Motion to Suppress [Doc. No. 218] is DENIED.

I.   **Background Based on the Motion to Suppress Record**

On December 14, 2021, at approximately 1:00 p.m., investigators viewed a Snapchat live video posted by the user "eyungclout3," with a display name of "E Glizzy." Mot. to Suppress, Ex. A, Aff. of Brian Ball ¶ 27 [Doc. No. 218-1] ("Ball Aff."). The video was marked "3h ago," which investigators understood "to mean that the user had filmed and posted the video approximately three hours before on that same day." Id. The video featured a "diamond-studded

chain with a circular pendant" with a picture of a deceased individual known to the investigators as a murdered "D Street Projects Gang" member. Id. The officer also observed "what appeared to be a black semi-automatic Glock firearm with an apparent extended magazine." Id.

Investigators determined that the Snapchat account belonged to Edilson Pinto, who they knew as an associate of the D Street Projects Gang and an affiliate of the "Heath Street Gang" active in Boston's Jamaica Plain neighborhood and other areas. Id. ¶¶ 5, 25, 28–29. The account profile featured a "bitmoji" icon wearing a Detroit Tigers hat and shirt. Id. ¶ 28. According to investigators, "the Detroit Tigers 'D' is a D Street Projects Gang identifier." Id.

Investigators also reviewed a Facebook account with the username "Official Eglizzy." Id. The Facebook account's profile image, which investigators compared to booking and Registry of Motor Vehicles ("RMV") photos of Pinto, was that of Pinto wearing a diamond-studded chain and pendant that "appeared identical" to the chain and pendant observed in the Snapchat video. Id. Investigators further determined that Pinto was not authorized to possess a firearm in Massachusetts and had previously been arrested and charged with "various firearms offenses" in Dorchester District Court, in connection with a March 2021 "shots fired investigation . . . during which a loaded 9mm firearm was recovered from Pinto's jacket pocket." Id. ¶¶ 25, 28.[1] Believing that Pinto was "illegally armed with a firearm[,]" investigators "made attempts to locate [him] in the area of the D Street Housing Development in South Boston." Id. ¶ 30.

Around 2:40 p.m., four officers with the Boston Police Youth Violence Strike Force observed Pinto driving a silver Mitsubishi Outlander on Flaherty Way. Boston Police Reps. ECF

---

[1] The March 2021 Dorchester District Court case against Pinto was "open" when investigators encountered Pinto and Defendant on December 14, 2021. Mot. to Suppress, Ex. B, Dec. 14, 2021 Boston Police Reps. ECF 6, 8 [Doc. No. 218-2] ("Boston Police Reps.").

6, 8 [Doc. No. 218-2]. When the vehicle turned left onto D Street, the officers observed that Pinto was traveling with two other individuals. Id. The officers drove in front of the vehicle and stopped it, intending to continue their investigation into Pinto's possible possession of a firearm. Id. at 6–8.

Two officers approached the vehicle and ordered Pinto to exit. Id. at 7–8. When Pinto did not respond, the officers removed Pinto from the vehicle and placed him in handcuffs. Id. The vehicle, which had not been placed in park, rolled into a police cruiser. Id. A third officer approached the passenger side of the vehicle, spoke to the front passenger, and "immediately recognized the back seat passenger as Joan Avalo, an individual known to him from previous encounters." Id. at 7, 9.[2] The third officer removed the front passenger, and a fourth officer removed Defendant from the vehicle. Id.

An officer then searched the vehicle and located a grey, unlocked "Gorilla Box" brand case (the "Gorilla Box") in the back pocket of the driver's seat, directly in front of where Defendant had been sitting. Id.; Ball Aff. ¶ 32 [Doc. No. 218-1]. The officer noticed that the Gorilla Box "had several magnets affixed to the bottom[,]" which he believed to be a "'hide[]' used by drug dealers to transport quantities of narcotics often by attaching the box to the underside of motor vehicles." Ball Aff. ¶ 32 [Doc. No. 218-1].[3]

---

[2] According to investigators, Defendant was believed to be a "member/associate of the Heath Street Gang" and "affiliated with the D Street Projects Gang and the Boston chapter of the Latin Kings." Ball Aff. ¶ 24 [Doc. No. 218-1]. Defendant's previous encounters with law enforcement include arrests "for armed robberies, drug offenses, and firearms violations, often in the company of other Heath Street Gang members/associates." Id.

[3] The affidavit states further that the officer observed that "the box was large enough to hold a firearm." Ball Aff. ¶ 32 [Doc. No. 218-1]. Defendant maintains that the box "was too small to hold the gun that [law enforcement] sought." Mem. ISO Mot. to Suppress 8 [Doc. No. 219]. The record does not specify whether the Gorilla Box was a "standard" or "plus" size. The largest outer dimension of a "standard" size Gorilla Box is 3.62 inches, see Mem. ISO Mot. to Suppress,

3

Upon opening the Gorilla Box, the officer observed two plastic bags of brown powder and three bags of a "white rock substance," which the officer believed to be fentanyl and cocaine base, respectively. Boston Police Reps. ECF 7, 9 [Doc. No. 218-2]. Neither Defendant nor Pinto claimed knowledge or ownership of the Gorilla Box or its contents. Id. Investigators also determined that the vehicle was a rental and was not rented in the name of Pinto, Defendant, or the front passenger. Id.; Ball Aff. ¶ 33 [Doc. No. 218-1]. Both Pinto and Defendant were arrested. Ball Aff. ¶ 34 [Doc. No. 218-1].

Officers seized a blue iPhone from Defendant's person at the time of his arrest and a white iPhone from his person while later searching him at Boston Police District D-4 ("District D-4"). Id. ¶¶ 34, 37. The bags containing the suspected drugs were also weighed at District D-4, with the two bags believed to contain fentanyl weighing approximately sixty-nine grams and the three bags believed to contain cocaine base weighing approximately twenty-nine grams. Id. ¶ 39; Boston Police Reps. ECF 7, 9 [Doc. No. 218-2].

## II.   Legal Framework

### A.   *Ability to Assert a Fourth Amendment Challenge*

"To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched." United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011) (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)). This inquiry involves a two-part test: "first, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that

---

Ex. F, Gorilla Box Standard Prod. Info. 1-2 [Doc. No. 219-4], while the largest outer dimension of a "plus" size Gorilla Box is 4.72 inches, see Mem. ISO Mot. to Suppress, Ex. G, Gorilla Box Plus Prod. Info. 1-2 [Doc. No. 219-5].

4

expectation is one that society is prepared to recognize as objectively reasonable." Id. at 48–49 (citation and quotation omitted).

      B.    *The Warrant Requirement*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant are "'per se unreasonable [under the Fourth Amendment] subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). If a warrantless search does not fall within an exception, evidence seized during that search may not be used against the defendant, Wong Sun v. United States, 371 U.S. 471, 488 (1963), and is instead suppressed "to deter future Fourth Amendment violations[,]" Davis v. United States, 564 U.S. 229, 236–37 (2011).

The automobile exception allows a law enforcement officer to search a vehicle without a warrant so long as the officer has probable cause to believe that the vehicle contains contraband. See Carroll v. United States, 267 U.S. 132, 154 (1925). Where law enforcement has probable cause to search a container in a car, the automobile exception also allows the search of that container without first obtaining a warrant. See California v. Acevedo, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands[.]" Gerstein v. Pugh, 420 U.S. 103, 121 (1975). Rather, it exists where "the facts and circumstances within [the officers'] knowledge and of which they had

5

reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [arrestee] had committed or was committing an offense." United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (internal quotations omitted) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).

      C.    *Investigatory Stops*

To pass constitutional muster, a warrantless "investigatory stop[], familiarly known as [a] Terry stop[], . . . . must be justified at its inception." United States v. Pontoo, 666 F.3d 20, 26 (1st Cir. 2011) (citing Terry v. Ohio, 392 U.S. 1, 19–20 (1968) and United States v. Ruidíaz, 529 F.3d 25, 28 (1st Cir. 2008)). "In addition, the actions taken must be 'reasonably related in scope to the circumstances which justified the interference.'" Id. (quoting United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998)).

A Terry stop is justified at its inception where it is "accompanied by reasonable suspicion." Id. There is no "simple, mechanical formula" for determining what reasonable suspicion is, but "it is less than probable cause and more than a naked hunch . . . [C]ourts must gauge its presence in a commonsense, case-by-case way, taking in the whole picture." United States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021) (quoting United States v. McGregor, 650 F.3d 813, 821 (1st Cir. 2011)). "[T]he reasonableness 'determination . . . entails a measurable degree of deference to the perceptions of experienced law enforcement officers[,]'" id. at 43–44 (quoting Ruidíaz, 529 F.3d at 29), and is based on the "totality of the circumstances," Florida v. Harris, 568 U.S. 237, 244 (2013). "The inquiry is designed to ascertain whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." Pontoo, 666 F.3d at 26 (quotation omitted).

6

**III.    Discussion**

Defendant moves to "suppress . . . all fruits of the unlawful searches and seizures," including the drugs recovered from the Gorilla Box and the two iPhones taken from his person. Mot. to Suppress 1 [Doc. No. 218].[4] He also requests an evidentiary hearing to resolve "factual questions about the size of the [Gorilla Box] compared to the size of the Glock police were searching for," which Defendant believes necessary for the court "to determine how accurate and reasonable the officer's assertion about his belief about the possibility that the gun would be inside that container was." Mem. ISO Mot. to Suppress 11–12 [Doc. No. 219].

Defendant asserts that the chain of events described above did not comport with the requirements of the Fourth Amendment at several junctures: (1) police officers improperly stopped the Mitsubishi Outlander in the first instance; (2) the warrantless search of the vehicle and the Gorilla Box violated Defendant's Fourth Amendment rights; and (3) the officers lacked probable cause to arrest Defendant and conduct a search of his person. Id. at 4, 7–8, 10. The court addresses each in turn, beginning with the initial stop of the vehicle.

    A.  *Stop of the Vehicle*

Although Defendant was not the driver or owner of the vehicle, he may nonetheless challenge the legality of the stop under the Fourth Amendment. See United States v. Campbell, 741 F.3d 251, 260 (1st Cir. 2013) (although defendants had no possessory interest in vehicle, they were seized "as passengers in the stopped automobile" for Fourth Amendment purposes and

---

[4] Investigators later searched Defendant's two iPhones pursuant to a warrant. Opp'n 1 [Doc. No. 246]. Defendant is not seeking to suppress that search with this motion but notes: "Should the instant motion to suppress be allowed, the phones would be fruit of the poisonous tree. Should the motion to suppress be denied, [Defendant] would seek to file a motion to suppress the search of the phones pursuant to the search warrant." Mem. ISO Mot. to Suppress 3 n.1 [Doc. No. 219].

could contest the stop); United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006) (similar). Defendant asserts that the initial stop of the Mitsubishi Outlander was "unsupported by probable cause, or even reasonable suspicion." Mem. ISO Mot. to Suppress 4 [Doc. No. 219]. In Defendant's view, where officers stopped the vehicle without having observed a traffic infraction, and where officers "did not take steps to further investigate or learn any more information" even if they were justified in "conduct[ing] a threshold inquiry," the stop was unconstitutional. Id. at 5. The government argues that the stop of the vehicle was "permissible under the Fourth Amendment as a Terry stop." Opp'n 2 n.2 [Doc. No. 246]; see id. at 15–17.

The court finds that, based on the totality of the circumstances, officers had the requisite reasonable suspicion to stop the vehicle in which Defendant was travelling. See Florida, 568 U.S. at 244; Pontoo, 666 F.3d at 26. At the time of the stop, officers had viewed a timestamped image of a gun posted to Pinto's Snapchat account hours earlier and could further validate Pinto's identity by cross-referencing information on the Snapchat account, Pinto's Facebook account, booking and RMV photos, and officers' personal knowledge of Pinto. See, e.g., United States v. Brown, 114 F.4th 253, 257–58 (4th Cir. 2024) (Instagram video showing defendants "waving firearms and pointing them directly at the camera" provided reasonable suspicion of state firearm law violation to stop defendants under Terry); United States v. Torres, 853 Fed. App'x 151, 152 (9th Cir. 2021) (mem.) (video of defendant "posing with a gun at the house of a local gang member" recently posted to social media contributed to reasonable suspicion justifying stop of defendant); United States v. Borges-Sanchez, 2023 WL 2950579, at *5 (D.P.R. Apr. 14, 2023) (even if Instagram account holder did not appear with firearms in posted video recordings and photographs, that the video recordings and photographs "show[ed] firearms and firearms being

discharged" were "sufficient . . . to have reasonable suspicion that [the account holder] had access to firearms or constructive possession of firearms.").

As described above, the officers confirmed Pinto's age, which was below the minimum age required for a firearm license in Massachusetts; were aware that he was a defendant in an open state case involving firearm possession; knew of his affiliation with two gangs active in the area; and observed what they believed to be gang identifiers in Pinto's Snapchat profile. See United States v. Sokolow, 490 U.S. 1, 8 (1989) (in the reasonable suspicion analysis, courts must consider "the totality of the circumstances – the whole picture" (quotation omitted)); Ruidíaz, 529 F.3d at 30 ("[T]he individual facts, taken in the aggregate, seem sufficient to trigger a reasonable suspicion that some criminal activity was afoot[.]"). Thus, even if the officers observed no traffic infraction, they reasonably suspected Pinto of being "illegally armed with a firearm," such that their observation of him as the vehicle's operator was a sufficient basis for the officers to stop the vehicle.

Defendant further asserts that, even if the officers possessed the requisite reasonable suspicion to stop the vehicle and "conduct a threshold inquiry," they neither had, nor did they sufficiently develop, probable cause to extend their stop of Defendant. Mem. ISO Mot. to Suppress 5–6 [Doc. No. 219]. To the extent Defendant challenges the length of time that passed between the initial stop of the vehicle and the initiation of the vehicle search, there is nothing in the record to indicate that the officers acted in a dilatory or otherwise unreasonable manner in stopping the vehicle, removing and detaining an individual they reasonably suspected of illegal firearm possession, and subsequently removing Defendant and the front passenger from the vehicle while investigating a potential crime. See Pontoo, 666 F.3d at 31 ("The appropriate length of a Terry stop is gauged by whether the officer diligently pursued a reasonable

9

investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions."); Acosta-Colon, 157 F.3d at 14 ("The [Terry] doctrine provides that 'based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or "seizure" of an individual to investigate suspected past or present criminal activity.'" (quoting United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996), cert. denied, 519 U.S. 1093 (1997)).

    B.    *Search of the Vehicle and the Gorilla Box*

Defendant next asserts that the warrantless searches of the vehicle and the Gorilla Box in the back pocket of the driver's seat were unreasonable. Mem. ISO Mot. to Suppress 7–8 [Doc. No. 219]. The government contends that the Defendant cannot challenge the search of the vehicle and the Gorilla Box where Defendant was merely a passenger and had no possessory interest. Opp'n 8 [Doc. No. 246].

Although passengers with no possessory or property interest in a vehicle in which they are travelling may raise a Fourth Amendment challenge to the stop of that vehicle, as discussed above, such passengers may not raise a Fourth Amendment challenge to the search of that vehicle. Campbell, 741 F.3d at 263 ( "[W]e have held squarely that passengers in an automobile who assert no property or possessory interest in a vehicle cannot be said to have the requisite expectation of privacy in the vehicle to permit them to maintain that the search did not meet Fourth Amendment standards[,]" (citing Rakas v. Illinois, 439 U.S. 128 (1978)); see United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012). Instead, such passengers lack "standing"[5]

---

[5] "While the Supreme Court noted that this threshold analysis is more properly placed within the purview of substantive Fourth Amendment Law than within that of standing . . . courts continue to refer to it as an issue of 'standing.'" United States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008) (cleaned up) (quotations omitted).

to challenge the search of the vehicle, as they "ha[ve] made no showing that [they have] a legitimate expectation of privacy" in the vehicle and are therefore not subject to an infringement upon their Fourth Amendment rights should the vehicle be searched. Symonevich, 688 F.3d at 19.

Here, Defendant has not asserted a possessory or property interest in the Mitsubishi Outlander in which he was traveling. In his affidavit, for example, Defendant states that he "was a passenger in a car that was being driven by Edilson Pinto"; "understood that Mr. Pinto lawfully possessed that vehicle"; and "was a guest of Mr. Pinto in that car." Mem. ISO Mot. to Suppress, Ex. C, Aff. of Joan Avalo-Quezada ¶¶ 2–4 [Doc. No. 219-1] ("Avalo-Quezada Aff."). The vehicle, which was a rental, was rented in the name of "Leonardo Roa," and Defendant "denied ownership" of the vehicle when questioned by officers at the scene. Boston Police Reps. ECF 7, 9 [Doc. No. 218-2]. Where Defendant does not suggest that he owned or otherwise possessed the vehicle, and where he in fact disclaimed ownership of the vehicle, Defendant's subjective belief that "[Pinto's] car was a space where we would have privacy from others, and where we would be free from unconsented to searches and seizures," Avalo-Quezada Aff. ¶ 5 [Doc. No. 219-1], does not amount to a reasonable expectation of privacy in the vehicle or unclaimed containers therein. See Campbell, 741 F.3d at 264 (no reasonable expectation of privacy in searched vehicle where defendant "asserted . . . that he did not lease the car"); United States v. Aguirre, 839 F.2d 854, 857 (1st Cir. 1988) (no standing without evidence defendant owned or leased the searched vehicle).

Defendant also has asserted no possessory or property interest in the Gorilla Box, see generally Avalo-Quezada Aff. [Doc. No. 219-1], and therefore may not assert any claim as to the search of that container. See Lipscomb, 539 F.3d at 35–36 ("[T]he defendant carries the burden

11

of establishing that he had a reasonable expectation of privacy with respect to the area searched or, as in this case, the items seized."); United States v. Garcia-Rosa, 876 F.2d 209, 218–20 (1st Cir. 1989) (no expectation of privacy in contents of a small box found in dresser drawer in defendant's bedroom where defendant "never claimed that the box was his or explained why he had a subjective, let alone an objectively reasonable, expectation of privacy in its contents"), vacated on different grounds sub nom., Rivera-Feliciano v. United States, 498 U.S. 954 (1990).

Accordingly, Defendant lacks the requisite standing to challenge the search of the vehicle or the Gorilla Box, or the seizure of drugs from the latter.

C. *Arrest of Defendant and Search of Defendant's Person Incident to Arrest*

Finally, Defendant argues that "in addition to being fruit of the poisonous tree," evidence taken from Defendant's person, including the two cell phones, "must also be suppressed because the arrest was unlawful and not based on probable cause." Mem. ISO Mot. to Suppress 10 [Doc. No. 219]. In response, the government asserts both that the arresting officers possessed the requisite probable cause and that the cell phones seized from Defendant were found pursuant to a lawful search incident to arrest. Opp'n 9 [Doc. No. 246].

Defendant's "fruit of the poisonous tree" argument is moot in light of the court's findings, supra, that the stop of the Mitsubishi Outlander did not violate Defendant's Fourth Amendment rights, and that Defendant does not have standing to challenge the search of the vehicle and the Gorilla Box. Accordingly, the court turns to the lawfulness of Defendant's arrest.

In Maryland v. Pringle, 540 U.S. 366, 368 (2003), a police officer stopped a sedan carrying three occupants for a speeding violation in the early morning. After the officer observed "a large amount of rolled up money inside" the sedan's glove compartment, the officer received consent from the driver to search the sedan, resulting in the discovery of "five plastic glassine

baggies containing cocaine" located "behind the back-seat armrest." Id. When questioned by the officer searching the vehicle, none of the three occupants took ownership of the money or cocaine, and all three were arrested. Id. at 368–69. The Supreme Court later held that, on these facts, the officers involved in the stop and arrest could make "an entirely reasonable inference . . . that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." Id. at 372. Therefore, officers acted reasonably in concluding that there was probable cause to believe one of the occupants "committed the crime of possession of cocaine, either solely or jointly" and arresting the occupant. Id. at 372, 374; see Wyoming v. Houghton, 526 U.S. 295, 304–05 (1999) ("[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.").

The Court's reasoning applies with equal force here. Defendant does not dispute that the Gorilla Box containing drugs was found in the back pocket of the driver's seat, directly in front of Defendant and accessible to him. See Boston Police Reps. ECF 7, 9 [Doc. No. 218-2] (Defendant "had been observed sitting directly behind the driver in the rear seat, with the pocket containing the drugs in front of him"). Like the trio in Pringle, neither Defendant nor Pinto claimed knowledge or ownership of the Gorilla Box. Id.; Ball Aff. ¶ 33 [Doc. No. 218-1]. Based on this information, officers could reasonably impute ownership of the purported drugs to Defendant, either independently or in concert with Pinto, and could therefore arrest Defendant without a warrant on the basis of probable cause. See Pringle, 540 U.S. at 370 (warrantless arrest of a person in a public places is "consistent with the Fourth Amendment if the arrest is supported by probable cause"); see also United States v. Davis, 909 F.3d 9, 18–19 (1st Cir. 2018)

13

("[E]vidence of an individual's control over the area where contraband is found . . . is valid circumstantial evidence of constructive possession." (quotations omitted)).

Where the arrest of Defendant was thus lawful, the searches of Defendant incident to that arrest were also lawful. See Arizona v. Gant, 556 U.S. 332, 338 (2009) (search incident to lawful arrest is an exception to the warrant requirement that "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations"). Thus, officers' searches of Defendant's person at the time of arrest and at District D-4 "per the usual booking procedures," Ball Aff. ¶¶ 35, 37 [Doc. No. 218-1], were squarely within "the universe of constitutionally reasonable searches." United States v. Mulkern, 49 F.4th 623, 629 (1st Cir. 2022). Accordingly, neither the arrest of Defendant nor the subsequent searches of Defendant incident to his arrest violated his Fourth Amendment rights.

### IV.  Conclusion

For the foregoing reasons, Defendant's Motion to Suppress [Doc. No 218] and his request for an evidentiary hearing contained therein are DENIED.

IT IS SO ORDERED.

December 10, 2025                    /s/ Indira Talwani
                                     United States District Judge